FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 04 JUL -9 PM 3: 51
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SYLVESTER CONNER, | } | |
| Plaintiff, | } | |
| v. | } | Case No.: CV 01-P-3060-S |
| TUSCALOOSA STEEL CORPORATION, | } | ENTERED |
| Defendant. | } | JUL - 9 2004 |

## MEMORANDUM OPINION

The court has before it Defendant's Motion for Summary Judgment. (Doc. # 30). The motion has been fully briefed and, by order dated April 21, 2004, the court advised the parties that the motion for summary judgment would be under submission, without oral argument, as of April 30, 2004. (Doc. # 53). Plaintiff Sylvester Conner commenced this action by filing a complaint on November 30, 2001, asserting claims under 42 U.S.C. §1981 for racial discrimination and retaliation in employment.[1] Plaintiff alleges that he was denied several promotions because of his race or in retaliation for his complaints of racial discrimination. For the reasons outlined below, Defendant's Motion for Summary Judgment is due to be granted because there are no disputed issues of material fact and Defendant has demonstrated that it is entitled to judgment as a matter of law.

**I.   Legal Standards for Evaluating a Summary Judgment Motion**

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R .Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick*

---

[1] Although Plaintiff originally alleged a hostile environment claim, he conceded that claim in his summary judgment brief. (Doc. # 38).



*v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 113 S. Ct. 2742, 2747-48 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817 (1973); *Texas Dept. of Community Affairs v. Burdine*, 101 S. Ct. 1089 (1981), as modified by *Desert Palace v. Costa*, 123 S. Ct. 2148 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[2]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment

---

[2] Here, Plaintiff has presented only circumstantial evidence of racial discrimination. (Doc. # 38).

action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 93 S. Ct. at 1824-25; *Burdine*, 101 S. Ct. at 1093-94; *Desert Palace*, 123 S. Ct. at 2154-55.

**II.     Relevant Undisputed Facts[3]**

Defendant, Tuscaloosa Steel Corporation, is a producer of hot rolled steel. Plaintiff, who is African American, was hired by Defendant in August 1990 as a temporary expediter. (Doc. # 39, Ex. 1, at 137, 143). Approximately six months later Plaintiff was promoted to a permanent position as upcoiler operator and he worked in an air-conditioned booth in the hot mill. (Doc. # 39, Ex. 1, at 143-45, 147, 149-51).

According to the Defendant's list of job classifications, at the time Plaintiff was an upcoiler operator, hot mill positions ranked from lowest to highest as follows: test expeditor, mill crane worker, upcoiler operator, inspector, furnace operator, and roller. (Doc. # 39, Ex. 1, at 152, 166). Although Plaintiff was offered a promotion to inspector only a few years after his promotion to upcoiler operator, he declined it because he enjoyed the air-conditioned booth in which the upcoiler operator worked. (Doc. # 39, Ex. 1, at 158).

In 1998, Defendant reduced its plant staff from four to three crews and Plaintiff, as part of the general labor pool, was reassigned to the day shift working in the caster maintenance area. (Doc. # 39, Ex. 1, at 152, 177, 179; Doc. # 31, Ex. 6). Although Plaintiff retained the title of "upcoiler operator" after he was moved to maintenance, he was trained to perform maintenance duties in the caster area and was satisfied with his new duties because he liked his supervisor and enjoyed the day

---

[3] If facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

shift. (Doc. # 39, Ex. 1, at 184). During this time, Plaintiff occasionally assisted with production in the caster; Plaintiff estimates that "it might have been a month" that he worked in that capacity. (Doc. # 39, Ex. 1, at 360-361).

In December 1999, Defendant began restructuring its job classification system by implementing a plan referred to as "Team Working" or "Team Building." (Doc. # 39, Ex. 1, at 185). Under the new system, all hourly positions were consolidated into Team Member I or Team Member II positions. (Doc. # 35). Team Member I positions were higher ranked and paid more than Team Member II jobs. (Doc. # 35). "Aspiration Interviews" were conducted before the conversion to determine the job(s) desired by each employee and, based on those assessments, individuals were selected for management positions or Team Member positions. (Doc. # 31, Ex. 11).

As part of the conversion process, Plaintiff applied for Team Member I positions in both the caster area and planned maintenance. (Doc. # 39, Ex. 1, at 193, 196, 213, 330). Plaintiff was not offered the positions to which he applied but instead was given the choice between two Team Member II positions in either the hot mill or the warehouse. (Doc. # 39, Ex. 1, at 203-05). Plaintiff asked Dave Tarasevich (then President of Tuscaloosa Steel) about the possibility of "going back to . . . the upcoiler" position, but Tarasevich told him that he had been away from that job too long to return to it. (Doc. # 39, Ex. 1, at 203-06). Of the two positions offered to him, Plaintiff chose the Team Member II position in the warehouse. (Doc. # 39, Ex. 1, at 199-203).

Several African American employees received Team Member I positions in the caster during the transition to Team Working. (Doc. # 31, Ex. 5).

4

In a March 2000 letter to Plaintiff, Tarasevich outlined reasons why he was not selected for a Team Member I position. (Doc. # 31, Ex. 8). [4] Plaintiff had scored below average on a set of tests given to all maintenance employees when he was working in the caster maintenance department, indicating that Plaintiff was "*not qualified* to be a Maintenance Technician *at this time*." (Doc. # 31, Exs. 7, 8 (emphasis in original)). Tarasevich noted that Plaintiff's decision to apply only for Team Member I positions in the caster area during the transition "was in direct opposition to our agreed course in December 1999. The Hot Mill Team Member Positions were your best chance at achieving your Team Member I goal. Even an application to the CTL [cut-to-length] would have shown your interest -- You ignored both!" (Doc. # 31, Ex. 8).

Plaintiff's explanation for not seeking a hot mill position was, "[a]t that time, sir, I didn't want to apply for a hot mill position." (Doc. # 39, Ex. 1, at 330). Tarasevich noted that Plaintiff's "lack of ambition ten years ago by staying on the [up]coiler job for your *own* reasons [rather than accepting the promotion to inspector] is haunting you now." (Doc. # 31, Ex. 8). Tarasevich stated that, although he had encouraged Plaintiff to take maintenance courses at the local community college with the company's support and had given him the opportunity to train with the caster maintenance workforce in an attempt "to show [Plaintiff his] true potential," Plaintiff failed to capitalize on these opportunities and instead demonstrated only a "counterproductive" attitude and lack of motivation. (Doc. # 31, Ex. 8). Scott Anders, the Maintenance Engineer in the caster, also reported that Plaintiff failed to demonstrate initiative within the maintenance department. (Doc. #

---

[4] Although Plaintiff testified at his deposition that he never received the letter from Tarasevich, (Doc. # 39, Ex. 1, at 223-245), his brief in opposition to summary judgment is devoid of any reference to the letter, much less refutation of Tarasevich's comments about Plaintiff's performance, work ethic, attitude, and test results.

31, Ex. 6).

Sometime in 2001, Plaintiff complained to managers Doug Payne and Craig Hamner that he believe there was an ongoing problem with the way the African American employees were treated on the cutting line. (Doc. # 39, Ex. 1, at 269). In March 2002, Plaintiff met with Colin Muncie (then President of Tuscaloosa Steel) to complain about racial issues and, in April 2002, Plaintiff outlined those complaints in a letter to Muncie, including his belief that a negative performance evaluation and his non-selection for promotions were because of his race or in retaliation for complaints[5] and his dissatisfaction with the way Doug Payne (white manager) treated African American employees. (Doc. # 39, Ex. 1, at 372, Ex. 25).

Plaintiff is currently employed by Defendant as a Team Member II on the production line in the "cut to length" ("CTL") department. (Doc. # 39, Ex. 1).

### III. Applicable Substantive Law and Discussion

#### A. Disparate Treatment

In order to establish a *prima facie* case of disparate treatment in promotions based on race, Plaintiff must show: (1) he is a member of a protected class; (2) he suffered an adverse job action; (3) his employer treated similarly-situated employees outside his classification more favorably; and (4) he was qualified to do the job. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S. Ct.

---

[5] Although Plaintiff's April 2002 letter to Muncie complains that Aubrey Wilson completed a negative appraisal form "attempt[ing] to assassinate my work and character . . . . in retaliation of my complaints of racial discrimination," Plaintiff's retaliation claim in this case appears to be based *solely* on his failure to receive promotions. (Doc. # 39, Ex. 25). Plaintiff does not claim that the negative evaluation *itself* was retaliatory, only that his complaint about the negative evaluation constituted protected conduct. (Doc. # 38). In fact, neither the parties' briefs nor evidentiary submissions provide an evidentiary cite for the appraisal form, which appears to be absent from the summary judgment record. Accordingly, the court will only consider Plaintiff's complaint about the appraisal form as potential protected conduct, not as a separate claim for retaliation.

at 1824; *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted); *Coutu v. Martin Cty. Bd. of Cty. Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995).

Plaintiff argues that, because of his race, he was not promoted to the Team Building I positions in the caster and in planned maintenance when those positions became available during the Team Working transition in December 1999. (Doc. # 39, Ex. 1, at 334).[6] Defendant argues that

---

[6] In addition to these two positions, Plaintiff's opposition brief raises, for the first time, race discrimination claims based on the denial of certain Team Member I positions in the caster, hot mill, and plate finishing areas for which Plaintiff allegedly interviewed sometime after the Team Working transition took place. (Doc. # 38). Although Plaintiff testified at his deposition that he interviewed for other positions, Plaintiff could not identify when those positions were available, whether or not he submitted a written application, who was the successful recipient of those positions, or even if those positions were separate and apart from the two positions already claimed. (Doc. # 39, Ex. 1, at 216-218). Notably, Plaintiff only discussed those positions in response to questions from opposing counsel at his deposition. (Doc. # 39, Ex. 1, at 216-17). He never claimed that he was denied those positions because of his race nor even hinted that he was dissatisfied with allegedly not being chosen. (*Id.*) In fact, Plaintiff's deposition testimony unequivocally establishes only two positions as the basis for his disparate treatment promotion claim in this case -- Team Member I in the caster and Team Member I in planned maintenance.

> Q. Are there any other jobs at Tuscaloosa Steel that you feel you were denied because of your race, or promotions?
>
> A. No sir.
>
> Q. No. Okay. So the planned maintenance and the Team I Caster are the only two jobs that you've been denied or you claim you've been denied because of your race, is that correct?
>
> A. That I can recall, sir.
>
> Q. Now, previously you said that those were the only two. Now you don't recall. Is there something that you're thinking of that might change your mind?
>
> Ms. Wilkinson: Anything else you can think of?
>
> A. No

7

Plaintiff has failed to make out a *prima facie* case because he was not qualified for the positions and has not demonstrated superior qualifications to those of the incumbents who received the positions. (Doc. # 33). The court notes that, although inability to demonstrate superiority of qualifications is relevant to the pretext analysis, the Eleventh Circuit does not require that proof to make out a *prima facie* case. *Lee v. GTE Fla., Inc.,* 226 F.3d 1229, 1253-54 (11th Cir. 2000); *see also Walker v. Prudential Property & Casualty Insurance Co.,* 286 F.3d 1270 (11th Cir. 2002). Nonetheless, the court will assume, without deciding, that Plaintiff has established a *prima facie* case of discrimination related to the two positions at issue.

Assuming the fulfillment of Plaintiff's burden to establish a *prima facie* case, the burden shifts to the Defendant to articulate one or more legitimate, nondiscriminatory reasons for the employment actions in question. A reason offered may be either objective or subjective if it is premised upon facts that are particular (i.e. clear and reasonably specific). *Chapman v. AI Transport,* 229 F.3d 1012, 1034-35 (11th Cir. 2000); *EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1280 (11th Cir. 2000). Neither the court nor the plaintiff should presume to judge whether an employment decision is fair or wise, but only whether it is legal. *Chapman,* 299 F.3d at 1030 n.19; *see also*

---

(Doc. # 39, Ex. 1, at 334). Although Plaintiff's complaint states generally "[t]hat there have been several positions as Team Member I since December 1999 and that Defendant has placed a white individual in every position of Team Member I," (Doc. # 1), Plaintiff admitted at his deposition that this broad statement was incorrect and that African American employees, in fact, have been promoted to Team Member I jobs since December 1999. (Doc. # 39, Ex. 1, at 342-344, 350). The court finds no basis to consider any purported claims for unidentified and unspecified Team Member I positions in the caster, hot mill, and plate finishing areas given that (1) Plaintiff has never claimed his race played a role in his not receiving those positions, and (2) they were raised by his counsel for the first time in opposition to the motion for summary judgment. *See e.g., Thomas v. T.G. Egan,* 1 Fed. Appx. 52, 54 (2nd Cir. 2001)(finding that claims raised for the first time after the summary judgment deadline are due to be dismissed); *Beckman v. United States Postal Service,* 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)(same).

*Pennington v. City of Huntsville*, 251 F.2d 1262 (11th Cir. 2001).

Here, Defendant's articulated reasons center on the relative qualifications of Plaintiff and the successful candidates. Defendant maintains that Plaintiff's poor performance and minimal experience, combined with his lack of initiative to further his employment, resulted in the decision to promote other more qualified individuals to the positions in question. (Doc. # 31, Ex. 8; Doc. # 33).

Viewing the facts in the light most favorable to Plaintiff, the court finds that there are facts from which a reasonable employer could determine that Plaintiff lacked the experience, performance, and initiative to perform the positions in question. For example, even though Plaintiff's title of "upcoiler operator" never changed, he undisputedly had performed maintenance -- not upcoiler – duties, only occasionally assisting with caster production, for at least a year before the decisions at issue were made. (Doc. # 39, Ex. 1, at 360-361). The President of Tuscaloosa Steel felt that Plaintiff had spent too much time away from his upcoiler duties to be promoted to a Team Member I position in the caster area, and he encouraged Plaintiff to explore Team Member I positions in other operations areas. (Doc. # 39, Ex. 1, at 205-06; Doc. # 31, Ex. 8). Moreover, Defendant felt that Plaintiff had demonstrated little ability or desire to progress to his managers, beginning with his refusal to accept a promotion to a higher-skilled, higher-paid position because he enjoyed working in an air-conditioned office. (Doc. # 31, Ex. 5). Finally, below average scores on the maintenance tests indicated that Plaintiff had not progressed or shown initiative in his current position and was not qualified to be Team Member I. (Doc. # 39, Exs. 6-8). The court finds that Defendant has met the "exceedingly light" burden to articulate a nondiscriminatory reason for the adverse action. *Walker v. NationsBank*, 53 F.3d 1548, 1556 (11th Cir. 1995).

In an attempt to show pretext, Plaintiff points to two types of evidence: (1) purported comparators who were selected for the positions at issue but had infractions similar to Plaintiff,[7] and (2) additional facts which, according to Plaintiff, dispute Defendant's perception of his initiative and performance. Neither of these approaches is persuasive.

First, Plaintiff's alleged "comparators"[8] -- consisting of some employees who turned down offers but later were offered promotions and some employees who were promoted despite performance problems -- do not demonstrate that Defendant's reasons are pretextual. Out of the 16 purported comparators relied on by Plaintiff in his opposition to summary judgment, only two, Donald Sanford and Jeffrey Phillips, both had turned down a prior job offer *and* had poor performance. (Doc. # 41, Ex. 15).[9] Defendant maintains that Sanford and Phillips are not proper comparators because they are not similarly situated to Plaintiff. (Doc. # 33). Although the court does question whether Sanford and Phillips are similarly situated to Plaintiff,[10] even assuming these

---

[7] There were a number of "Team Member I" positions available in the caster and planned maintenance areas.

[8] The court is not convinced that a comparator analysis is the proper methodology to show pretext related to a promotion decision. It may well be that Plaintiff's counsel, in using the term "comparators," intends to show pretext by demonstrating that the incumbents for the positions were less qualified than her client. Of course, to show pretext related to a promotion decision, a plaintiff must do more than show he was better qualified; he must meet the "slap in the face" standard analyzed *infra*.

[9] The other 14 alleged comparators who were chosen for the positions in question *either* had turned down a job offer or had bad performance, but not both. (Doc. # 41, Ex. 15).

[10] The undisputed evidence suggests that Sanford and Phillips are not "nearly identical" to Plaintiff given their length of employment and the circumstances surrounding their promotions. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Sanford was hired by Defendant three years before Plaintiff and, like Plaintiff, he did not receive a Team Member I position in the caster during the Team Working reorganization. (Doc. # 41, Ex. 15). Sanford bid on, and eventually was promoted to, Team Member I in the caster in May 2000; Plaintiff did not even bid on this position. (Doc. # 41, Ex. 15). Phillips was hired four years before Plaintiff and, because Phillips' Slabyard

10

employees *are* appropriately compared to Plaintiff, he has failed to show that he was "substantially more qualified than the person[s] promoted." *Lee v. GTE Fla., Inc.,* 226 F.3d 1229, 1253-54 (11th Cir. 2000); *see also Walker v. Prudential Property & Casualty Insurance Co.*, 286 F.3d 1270 (11th Cir. 2002).

Plaintiff even admitted at his deposition that his qualifications are not superior to those of the successful candidates for the two positions:

> Q. It is your contention that you were superior, your qualifications were superior to these individuals; is that correct?
>
> A. No, Sir?
>
> Q. Okay. So that's not correct?
>
> A. I am not saying that my qualifications were superior to anyone's qualifications. I didn't say that. I'm not saying that.

(Doc. # 39, Ex. 1, 321, 325). With respect to the Team Member I position in planned maintenance, Plaintiff stated:

> A. I wanted a planned maintenance position and I felt that I was just as qualified as the other guys that applied for it.
>
> Q. Did you point to any specific qualification that you have?
>
> A. I have done mechanical work before in the past.
>
> Q. So at some point you knew who received those jobs; is that correct?
>
> A. I can't recall exactly who received the job, but at that time, that I can recall, the individuals that received them had no more or no less qualifications that I did.

(Doc. # 39, Ex. 1, 325).

---

Crane Operator position was renamed as one of the caster "Team Member I" positions during Team Working, Phillips continued in the same position with a new title. (Doc. # 41, Ex. 15).

11

Those admissions, coupled with Plaintiff's failure to point to any evidence of superiority in his opposition brief and the court's inability to find any such evidence after an independent review of the record, leads to the conclusion that any disparities in qualifications in this case are not "so apparent as virtually to jump off the page and slap you in the face." *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000).

Second, even taking as true all of additional facts that Plaintiff points to as "evidence" of his demonstrated initiative and good performance, he has done nothing more than disagree with Defendant's assessment of his qualifications. Plaintiff does not dispute that he turned down a promotion; he merely disagrees that it demonstrated he lacked initiative to progress. Plaintiff does not dispute that his maintenance test results were below average; he only disagrees with Defendant's opinion that those results indicated he was not performing well enough for a promotion. It is well settled that Plaintiff's personal opinion of his qualifications does not create a genuine issue of material fact as to whether Defendant honestly believed that he was less qualified than the successful candidates. *Holifield v. Reno*, 115 F. 3d 1555, 1565 (11th Cir. 1997) (reiterating that the opinion of the decision-maker, not the employee's own perception of his own abilities, is what matters in an intentional discrimination case). The salient question is whether the Defendant's reasons, even if incorrect, were the real reason for his non-selection. There is no indication that they were not.

Accordingly, the court finds that summary judgment is due to be granted on Plaintiff's disparate treatment promotion claims because Plaintiff has not proved by a preponderance of the evidence that the legitimate reasons offered by Defendant are pretextual.

**B.     Retaliation**

Plaintiff also claims that he suffered retaliation for complaining about race discrimination.

(Doc. # 1). To establish a *prima facie* case of retaliation under Title VII, Plaintiff must prove (1) he participated in an activity protected by Title VII; (2) he suffered an adverse personnel action; and (3) there is a causal link between the protected activity and the adverse employment action. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).

Defendant argues that Plaintiff raises his retaliation complaint for the first time in his opposition to summary judgment. A review of Plaintiff's complaint reveals that, while it mentions the word "retaliation," it also mentions several other claims which are, in fact, not in the case. (Doc. # 1). Moreover, Plaintiff's retaliation claim is based on an adverse employment action that occurred in September 2002 -- almost one year *after* the complaint was filed. (Docs. # 1, 38). Plaintiff's complaint was never amended to assert this claim, and the deadline for amending pleadings expired on March 29, 2002.

Nonetheless, regardless of whether the retaliation claim is properly in the case, the court finds that summary judgment is due to be granted based on insufficiency of evidence. Plaintiff alleges that the denial of a promotion to Team Member I in mid-September 2002 was retaliation for race discrimination complaints made to managers sometime in 2001 and to Muncie in March 2002. (Doc. # 38). Even assuming that Plaintiff has established the first two prongs of his *prima facie* case (protected conduct and adverse action), the record is completely devoid of *any* evidence of a causal connection. The conclusory statement in Plaintiff's opposition brief -- that he "has put forth evidence sufficient to demonstrate a fact issue as to the existence of a causal connection" -- is unsupported by any evidentiary citations and insufficient. (Doc. # 38).

In fact, the undisputed record evidence suggests that the 2002 decision was entirely *unrelated* to Plaintiff's discrimination complaints. First, the persons to whom Plaintiff complained about

13

discrimination were not decision-makers with respect to the September 2002 position, and the person who did make the decision about the 2002 position was unaware that Plaintiff had complained. (Doc. # 41, at Ex. 17). Without evidence that the decision-maker was aware of his complaints, Plaintiff cannot establish a causal connection. *Clover v. Total System Serve.*, 176 F.3d 1346, 1354 (11th Cir. 1999)(holding that the decision-maker must be aware of the protected conduct); *Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1119 (11th Cir. 2001) ("[T]he Plaintiff must show that the person taking the adverse action was aware of the protected expression."). Second, the time lapse of five months between Plaintiff's last complaint and the decision not to promote him is insufficient to establish a causal connection. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing affirmatively several court of appeals cases for the proposition that a three to four month gap is not enough).

The court finds that Plaintiff has failed to establish a *prima facie* case of retaliation and therefore summary judgment is appropriate on this claim.

IV. **Conclusion**

For the reasons stated above, Defendant's motion for summary judgment is due to be granted. The court finds that no genuine issues of material fact remain for trial as to Plaintiff's claims and that Defendant is entitled to judgment as a matter of law. A separate Final Judgment will be entered.

**DONE** and **ORDERED** this ___9th___ day of July, 2004.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE